May it please the Court? Yes. Good morning, Your Honors. I'm – my name is Robert Freeman. I represent the appellants in this case. The appellants are Susan Suttles, Sherry Snyder, and Mark Martin, all officers – police officers of the North Las Vegas Police Department. Could you lift the mic up just a little bit? Sure. There you go. I also represent the City of North Las Vegas and the North Las Vegas Police Department. As you know, this is an interlocutory appeal from the Nevada District Court's denial of qualified immunity to the individual officers in this case. It is the appellant's contention that the Nevada District Court misapplied – misunderstood or misapplied the test for qualified immunity as announced in Saussure, at least with respect to a case involving an allegation of excessive force. Indeed, in the minute order denying the motion for summary judgment, the Court stated that it found the ultimate issue is a fact question, whether or not the officers acted reasonably under the circumstances. Counsel, what would you expect police to do when they come upon a woman who is completely naked, who is carrying a large knife and appears as if she's going to thrust that knife into someone? What do you expect them to do? Well, I expect them to do exactly what they did. Pardon me? I expect them to do exactly what they did. They confronted a situation unusual even for police officers in North Las Vegas. They disarmed her? They disarmed her. Right. And they tried to hold her from hurting herself as well as hurting anyone else? Yes, Your Honor. I represent the police officers. I understand. I think what they did was correct. My point is that it seems to me that the argument should be for immunity for those police. And it is. Okay. It is. I believe that the officers should have been granted immunity. I also believe that that immunity grant, had the Court applied the Saussure test to the facts that you state, Your Honor, I think they would have granted qualified immunity. I take it your point is that when the Court says if there's excessive force, there can't be qualified immunity, that's just dead wrong under Saussure? Yes, that is dead wrong. If that were the rule of law, then there would be no qualified immunity in an excessive force case. That was just about the rule before Saussure. At least in the case. That's what the rule used to be. It's not the rule anymore. Just about. The case came from this Court. Right. That's correct. I understand. Let me ask you a question. Okay. You know, in the Saussure analysis, there's a two-step approach. First, when you ask whether or not there's a, if you take the facts in the light, the version articulated by the plaintiff, assuming the plaintiff could prove those facts, have they stated a constitutional claim? And one could say here that, you know, under all the circumstances, just no disputed facts, taking everything in her version, you could say doesn't rise to the level of an unreasonable use of force under the circumstances, and therefore, as a matter of law, no constitutional violation. And that would end your, that would stop the qualified immunity analysis at the first step. Correct, Your Honor. Now, you could say also, you know, there's one version of her, there's one version you could possibly articulate that might suggest that you have to go down to the second step of the analysis. As I understand from at least reading the briefs and some of the declarations that took place, there's no dispute, they got her down on the ground, they handcuffed her, and, you know, they had to do what they had to do to get things under control. They used the leg sweep to get her down, they had difficulty handcuffing her, but eventually they got her handcuffed in a prone position on her stomach. They were able to get the leg, I forget the leg brace, whatever, flex cuffs on her legs, and they had her on the ground. She was, how was she at that point, from that moment on, isn't there kind of a dispute about whether or not the officers kept their knee on her back at that point? Well, I don't think there's a dispute, Your Honor. What do you point to that suggests that immediately, as soon as they had her on the ground in a prone position in cuffs, legs and hands, that they immediately got up? Well, all three officers testified that they stopped using whatever pressure they were using when they got the cuffs on. Now, there was a time lag between getting the handcuffs on and getting the flex cuffs on, and I want to point out that at no time were the flex cuffs attached to the handcuffs. We're not talking about a hostile situation. No, I understood that. I understood that. That's clear from the record. All of the officers testify that they... See, the impression I had, and maybe it's just an impression, but I understood it to be that the officers remained there to secure her. They either kept an elbow or they either kept an arm on her or somehow, even when she was cuffed, in the prone position to keep her down. That's certainly the allegation of the plaintiff. Well, if you take that as true for a moment, and that's not an unreasonable inference here, why don't you then have to go to the second step of the qualified immunity analysis and ask under those circumstances, would a reasonable officer believe that his conduct was constitutional? Indeed, I think that you might have to go to the second step. As this Court pointed out in the Drummond case, and that case was all about the pressure that the cops put on the subject, Mr. Drummond, after he was in handcuffs. Right. That's what caught my eye when I looked at the Drummond case. That's exactly kind of what happened there. But I want to point out the distinction between the facts in Drummond, and I'm sure you know what those distinctions are. In Drummond, Mr. Drummond, as the Court found, posed no threat to anybody. He was not accused of a crime. He was a mentally ill person that the police had had experience with. They knew they were going there solely to protect his own health, not for any other reason. The Court emphasized the fact that the officers put him in handcuffs and knelt on him, apparently knelt on his neck. Right. Despite the fact that he was not resisting to any degree. And on these facts, in this case, the officers can fairly be said to have done nothing inconsistent with Gloria Parker's health. I can't find anything in the record, in the affidavits, beyond the statement of that expert, and who knows where he's coming from, that they held her down at all after they had her cuffed. I don't think it exists, Your Honor. I think some of them said that the medics arrived there almost immediately. The medics arrived there almost immediately because the police officers called for medical attention almost immediately. They understood. You know, when you canvass the cases, and that's all you can really do in a qualified immunity case, when you canvass the cases and you look at the cases where qualified immunity was denied, either at the district court level or on a court of appeals, you find actions on behalf of law enforcement that can only be described as abusive or dismissive of the individual's health and welfare. I do have some evidence that someone said, one of the experts said that they held her down for 23 minutes with a knee in her back, which led to her being obfuscated because of the inability to fill her chest with air. Yes, Your Honor. And my point, and I think Your Honor's point is, is that I don't know where that 23-minute came from. That is not in the evidence. The witnesses who saw the confrontation, the eyewitnesses who saw the confrontation described it as two minutes on the ground. Well, I was looking for some statements that after they got her cuffed, the legs cuffed, that they immediately backed off from her. There isn't any evidence to that effect, I don't think. Well, if there isn't any evidence in the record, I was sure there was. I'm sure what there is in the record is the officers immediately pushed the hair out of her face, leaned down, talked to her, asked her if she was okay, told her that the medical personnel were on their way. These are things that are inconsistent with them still sitting on top of her or kneeling on top of her. And I would point out that Officer Martin's testimony didn't indicate that he was kneeling on top of her. His testimony indicated that he used his knee on her shoulder blade. That's a trained technique in order to gain control of the arm that he's trying to handcuff. He has her on the ground. Let's assume that he didn't have his knee in her back, but maybe just had his elbow or his hand on her to keep her down from maybe he was trying to protect her, but he still has force on her, keeps her down prone. Is there a dispute over that? I would say if there is a dispute over that, it's not relevant to the issue of qualified immunity, and this is why. In those cases where pressure is put on individuals that results in their either injury or death, we're talking about the body weight pressure. When you talk about the Simpson case that's cited in the plaintiff's brief, we had a correctional officer nicknamed Beef sitting on the person who weighed hundreds of pounds. When you talk about the Drummond case, you have officers kneeling. The evidence taken in the light most favorable to the plaintiff in that case was you had two officers kneeling directly on Mr. Drummond and perhaps on his neck. Now, in this case, it would be hard to characterize those actions as anything other than reckless, if they're not intentionally focused on injuring the person. You had officers and Drummond standing there laughing while the other officers were holding him down. You had this kind of reckless conduct, and I see my time's up. You had this kind of reckless conduct. I think that the distinction, if there is a dispute over the timing, that it is a dispute that wouldn't result in a denial of qualified immunity to these officers. These officers did whatever they had to do to resolve this situation. There's no allegation they could have done anything different. There's no evidence of abuse or dismissiveness of Ms. Parker's health. Okay, thank you, Counsel. Thank you. May it please the Court, Cal Potter on behalf of the decedent, Gloria Parker, her two daughters and her mother. The important aspect of this case has not been focused on or addressed in the opening argument here. This case deals specifically with a concept called positional affixia. Positional affixia has been well documented in law enforcement since 1992 through a study done by the San Diego Police Department. And what's important here in terms of the analysis that's looked at is in the concept of what a reasonable force, when you have facts that it should be known to the police, and the facts that are important and were testified to not only by my expert, but by the expert for the defendants is bizarre behavior. At what point do you contend that the force used by the officers became excessive? The force becomes excessive at the point where she is taken down to the ground. And the testimony from the officer, Martin, is that his knee is put into her back or shoulder area, held down. And then the other officer, Suttles, is on top of her legs and that she's being restrained by her ankles as well as handcuffing her, and she remains prone. So from your perspective, the force becomes excessive, is excessive at the moment they take her down to the ground and have her on the ground while they're trying to handcuff her, and she's resisting the handcuffing. Well, to the degree that she is resisting, the argument is she's also cap stunned at that point. O.C. spray is sprayed on her during that point in time. But what's important, Your Honor, is that at that point in time when she is in a prone position, she's handcuffed, she's now being held, and she stays in a prone position, is that becomes deadly force under the positional fixie and the training since 1992 that all law enforcement has undergone across the United States. So you have a situation by having her placed in a prone position, having his knee in her back, that she cannot breathe. And because she cannot breathe, she goes into this cardiac type arrest situation. We also know that she is under the influence of cocaine. Did the officers know that? Well, they did because they'd been out earlier in the day, and their training and the recognition and training of dealing with people under the influence is well known. And what we have are all the classic signs, not necessarily just from the testimony of my expert, but from the International Association of Chief of Police and the bulletins they send out to law enforcement. And what they look at are bizarre behavior, nakedness. This woman was naked. She was also engaged in bizarre behavior. And carrying a knife and waving a very large knife at them. Well, no, the knife was down at the time when they took her into custody. No, but she had it in her hand when they came upon her. When they came upon her, but she dropped it. And that also shows that she's not a danger in that sense. Just like the individual. I don't mean to be rude and interrupt you, counsel, but she wasn't just lying there waiting for them to put the handcuffs on. She was fighting with them. She was resisting, but she's incoherent, Your Honor. This isn't a situation where you have an individual that is committing a crime and in the commission of a crime. It's just like the Drummond case. You have mentally ill people. Law enforcement continually deals with mentally ill people. Or they deal with people who are under the influence. Incoherent. No individual is going to go out and commit a crime without any clothes on and a blouse on, carrying a bottle of water. That's what was in her other hand was a bottle of water and this butcher knife and incoherently mumbling. That's the testimony of the police officers as well as the witnesses that were there at that point in time. So what's important in focusing on what is reasonable police behavior is at the point of time when there's a failure to recognize that all of these factors, the sweating, the fact that she would be excessively strong, the protruding abdomen, this is a small woman, all of these factors police officers are trained to recognize in dealing with individuals that are acting in an incoherent manner. That is a given within both my expert as well as the defense expert. But more importantly, they're trained once they handcuff these individuals and they're face down, they're trained to pull them back up. That's north Las Vegas. That was in their policies, practices and procedures manual. You have to pull the individual up into a prone position so these types of things don't happen. Now, this isn't the first incident in north Las Vegas or in the Las Vegas Valley, nor was it the first incident in law enforcement. The case, the Drummond case did come down after Judge Hunt had made his ruling dealing with the qualified. At the time of this incident, what case would you point to that you believe should have alerted the officers? Well, I think the cases dealing with in Las Vegas, there was a Charles Bush case, it was a cocaine case. So, I mean, a case by our circuit or the Nevada Supreme Court or? The Gutierrez case was what we relied and what we cited the court to in the San Antonio case. And there were several other cases that looked to these types of situations, particularly dealing with positional asphyxia. It's not something that just came out of the blue. And it was something that the one officer testified she knew nothing about it. The other officer said he had some knowledge of it, that he had had some exposure to it. But clearly, across law enforcement, the testimony from Mr. Von Blaircon, who was former chief of police of Bellevue, Washington, it had been known it had been trained. It had been trained all across the country since 1992. So I think what's important in terms of looking at is there a case that's directly on point? I'm not looking for a case directly on point. You don't do that, but it would be helpful, but it's not necessary. What case would you say the officers should have guided the officers' sort of judgment here? They look to the same argument as made, of course, in the Drummond case. So it's not like we're on a maiden voyage here because this is the law of the Ninth Circuit, talking about the same type of arguments that when, in fact, the individual is taken down, the use of excessive force. And in Drummond, he became a vegetable or was placed into a coma, so they were speculating whether, in fact, that force was deadly in and of itself. But clearly the force here was. The testimony from the medical examiner expert is that this was a contributing factor and the factor that caused the death of Gloria Parker. So you have a situation where it was deadly force as applied in this particular instance. And so you have not only the progeny out of Tennessee v. Garner, although this wasn't per se shooting or beating an individual directly, it was clearly a factual issue as to how the force was applied and that it became deadly in this particular instance. Let me ask you this. I don't know what's going to happen here, but putting aside the claims against the police officers, do you have a claim against the city? Yes, we do. And that was on the negligent training. And that really isn't before the court because qualified immunity only applies to the individual officers. So that really shouldn't even be up here on appeal either. And I would submit that the court really doesn't have jurisdiction at this point in time because there is a factual determination. As this court has routinely held over a number of years dealing with Liston v. the County of Riverside, all of these excessive force claims are fact-driven. And because of that nature, I would submit to you that's what was held once again in Drummond, that this case, if it isn't on all fours, it's on at least three and a half with the Drummond case as to what occurred in Drummond and what occurred in North Las Vegas back in September the 16th of 1998. The ‑‑ I would also point out that Miles Jones, the doctor, also talked about ‑‑ You know, I know this isn't, you know, critical to the outcome, but after the officers had her on the ground in handcuffs, arms and ankles, what were they supposed to do? Their policy tells them get her up. Get them up in a sitting up position because, Your Honor, what happens? Now, she was squirming around. No, no, she wasn't. She was squirming around when they put the handcuffs on her. Right. But once you get her handcuffed and you've got three officers, Judge, you've got three officers, you've got her legs restrained, and you've got her handcuffed. Three officers can take care of an individual and keep the individual in a prone position. That's what their own policy and practice manual says that they're supposed to do. They wanted to put restraints on her legs because she was kicking. They wanted to put restraints on her legs. When she was kicking and she kicked them off, they went back and got some other restraints until they were able to restrain her? No, no. They had manacles that they were using for her wrists. They didn't have anything to put on her. They call them flex cuffs because they're flexible, and that's what they were using. She went to the car to get the flex cuffs. But they wanted to put restraints on her legs also. Correct. But they went to the car to get the flex cuffs. They had manacles. They had mechanical restraints on her arms. They had difficulty doing that, didn't they? They sat on her legs and put them on her. But that's not the point, Judge. That's not the excessive force. If that were the excessive force, we wouldn't be here. No, but the point of the force, no. The excessive force is when she is down on the ground after she's been handcuffed, after her legs have been strained, the officer is still on her back. That's when it's positional asphyxia occurs because you can't breathe. And why can't you breathe? Because you're under the influence of cocaine. You're in a situation where you're incoherent. Plus, you've been sprayed with capstan. OC spray has been used. That was a very mild strain. I mean, the pepper strain is not great, but they only gave her two whiffs of it. They didn't continue to do it. Two whiffs at point blank range, Judge, is pretty strong. I know. She had not been using cocaine. It may not have had that kind of effect that it did on her. Exactly. And that's what the whole point is in dealing with individuals that are either under the influence, whether it be alcohol or cocaine, but in this particular instance, the cocaine. That's what's important. That's why there's a recognition on the part that an individual is under the influence or mentally deficient. And that's what Drummond dealt with, and that's what this case deals with, with the positional asphyxia. That's what makes this case different. Thank you, counsel. Appreciate your argument. I don't have any more time. I'll give you 30 seconds. I want to point out, Your Honors, in response to counsel's argument, that the statement regarding training that was disseminated as a result of a 1992 San Diego study, there's no evidence that that study was ever disseminated to the North Las Vegas Police Department, and that study has been since disavowed by the author of it, Dr. Donald Ray, disavowed that study, in the Price case in 1998. I want to make it clear that Gloria Parker was pepper sprayed while she was still standing up. I think there was some confusion with the plaintiff's expert that she was pepper sprayed when she was on the ground. The pepper spray was used in an attempt to avoid what they later had to do, not as a punishment for struggling while she was still on the ground. Okay. Thank you. Thank you. Mullen v. Las Lomitas School District.
judges: Fernandez, Paez, Weiner